# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| L. LONDELL MCMILLAN, CHARLES SPICER, JR., and JOHNNY NICHOLAS NELSON TORRES, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2024-0016-KSJM |
| SHARON NELSON and NORRINE NELSON, individually, and BREANNA M. NELSON and ALLEN D. NELSON, in their capacity as co-trustees of the John R. Nelson Revocable Trust, | ) ) ) ) ) ) ) ) | |
| Defendants, and | ) ) | |
| PRINCE LEGACY, LLC, | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 26, 2024
Date Decided: July 5, 2024

Thomas W. Briggs, Jr., Tarik J. Haskins, Elizabeth A. Mullin Stoffer, Jacob M. Perrone, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Alan I. Silver, Tal A. Bakke, BASSFORD REMELE, P.A., Minneapolis, Minnesota; *Counsel for Plaintiffs L. Londell McMillan, Charles Spicer, Jr., and Johnny Nicholas Nelson Torres.*

Alexandra D. Rogin, Paul S. Seward, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Wilmington, Delaware; Stephen A. Ling, Karen D. Olson, SPENCER FANE LLP, Minneapolis, Minnesota; Courtney L. Creal, SPENCER FANE LLP, Nashville, Tennessee; *Counsel for Sharon Nelson, Norrine Nelson, Breanna M. Nelson, and Allen D. Nelson.*

**McCORMICK, C.**

The world-renowned recording artist Prince Rogers Nelson died unexpectedly on April 21, 2016. His six siblings inherited equal interests in his estate, and three of them assigned their combined 50% interest to Prince Legacy, LLC. Prince's former business advisors, L. Londell McMillan and Charles Spicer, Jr., assisted some of the heirs in the probate process. As compensation for their services, the heirs granted McMillan and Spicer each a 10% interest in Prince Legacy. They also vested broad and exclusive management authority in McMillan and Spicer as Managing Members of the LLC. One of the heirs, Sharon Nelson, came to regret this decision and inserted herself into management decisions—by demanding, for example, that the entire staff of the Paisley Park Museum be replaced. When McMillan and Spicer did not acquiesce to her demands, Sharon led the defendants' efforts to remove McMillan and Spicer as Managing Members by amending the LLC agreement. McMillan and Spicer, along with one of the heirs, filed this action seeking a declaration that the LLC agreement's unambiguous terms prohibit the defendants' attempts to amend it. The defendants moved to dismiss the complaint, and the plaintiffs moved for partial summary judgment. This decision denies the defendants' motion and grants summary judgment in favor of the plaintiffs.

I.    FACTUAL BACKGROUND

For the motion to dismiss, the facts are drawn from the Verified Complaint (the "Complaint") and the documents it incorporates by reference.[1] For the motion for partial summary judgment, the court draws on the undisputed facts and the plain

---

[1] C.A. No. 2024-0016-KSJM, Docket ("Dkt.") 1.

language of the Prince Legacy LLC Operating Agreement dated July 25, 2022 (the "LLC Agreement").[2]

### A.   The Interests In The Prince Estate

Prince's six siblings—Sharon, Norrine Nelson, John R. Nelson, Tyka Nelson, Omarr Baker, and Alfred Jackson—inherited equal interests in his estate.[3]

Tyka, Omarr, and Alfred, who were collectively entitled to 50% of the estate assets, sold their stake to a music publishing company, Primary Wave Music, LLC. Primary Wave later assigned its interests to an affiliate, Prince OAT Holdings LLC.

Sharon, Norrine, and John, who were collectively entitled to the other 50% of the estate assets, assigned 20% of their collective interests to McMillan and Spicer, former Prince advisors who had assisted them in the probate process. John passed away on September 3, 2021. His interests passed to the John R. Nelson Revocable Trust (the "Trust"). Breanna Nelson, Allen Nelson, and Johnny Nicholas Nelson Torres are co-trustees of the Trust.

Prince's estate was subject to proceedings before the Probate Division of the Carver County, Minnesota District Court (the "Probate Court"). Those proceedings concluded in August of 2022. Before distributing the estate assets, the Probate Court ordered the disaggregated heirs (those other than Prince OAT), to form a holding company to receive and jointly manage the estate assets with Prince OAT. This

---

[2] Compl. Ex A.

[3] This decision refers to the heirs by their first name. The court intends no disrespect.

allowed the disaggregated heirs to consolidate their 50% interest, thereby maintaining input and some control over the assets and Prince's legacy.

To hold their collective interests, Sharon, Norrine, the Trust, McMillan, and Spicer (each, a "Member") formed Prince Legacy (or the "Company") a Delaware limited liability company.[4] Through the LLC Agreement, the Members vested management of the Company in "Managing Members" and appointed McMillan and Spicer as Managing Members.[5] The remaining Members were "Non-Managing Members."[6]

At the Probate Court's direction, Prince OAT and Prince Legacy entered into a joint management agreement to manage the Prince estate. The agreement designated McMillan and Spicer as management representatives for Prince Legacy.

### B. The Prince Legacy LLC Agreement

The LLC Agreement contained provisions that made it difficult to alter Member composition and remove Managing Members. The relevant provisions of the LLC Agreement are quoted in full in the legal analysis. A brief summary of those provisions follows.

Section 6.2 sets forth the responsibilities and powers of the Managing Members, as well as the limited grounds for removing the Managing Members. It makes the Managing Members "responsible for the day-to-day management of the

---

[4] LLC Agr. at 1.

[5] *Id.* at 1, § 6.1.

[6] *Id.* at 1.

3

Company's business and affairs."[7]  It further provides that Managing Members could be removed only for failing to perform their responsibilities and only then with the remaining Managing Member's consent.  It states that if "any Managing Member fails to be able to perform his responsibilities or fails to provide day-to-day management of the Company, such Managing Member can be removed and/or replaced by the vote of the Members subject to the remaining Managing Member's mutual consent."[8]

Section 6.3 sets forth the limitations on the Managing Members' authority established in Section 6.2.  Specifically, Section 6.3 identifies nineteen actions the Managing Members can only take with the consent of at least 66 2/3% of the Members' "Percentage Interests" and nine actions the Managing Members can only take with the consent of 100% of the Members' Percentage Interests.

Section 6.5 expressly excludes the Non-Managing Members from participating in the control of the Company's affairs and from acting for or binding the Company. It provides that "[a] Member who is not a Managing Member shall not participate in the control of the Company's affairs and shall have no right or authority to act for or to bind the Company."[9]

Section 7.1 limits a Member's ability to transfer or sell the Member's interest. Entitled "Transfer of Interest of Member," Section 7.1 provides that a Member may

---

[7] *Id.* § 6.2.

[8] *Id.*

[9] *Id.* § 6.5.

4

not "sell, assign, transfer, mortgage, pledge, encumber, hypothecate, or otherwise dispose of all or any part of his interest in the Company . . . without first having obtained the written consent of one-hundred percent (100 %) of the Percentage Interests then held by the Members."[10]

## C. Efforts To Amend The Prince Legacy LLC Agreement

As alleged in the Complaint, before the parties signed the LLC Agreement, Sharon proposed that she be appointed as sole Managing Member. The other Members rejected that proposal. She then proposed that she be appointed co-Managing Member. The other Members rejected that proposal as well. Sharon ultimately agreed to McMillan and Spicer's appointment as Managing Members.

She later came to regret that decision and took efforts to insert herself into management decisions. For example, Sharon demanded that the entire staff of the Paisley Park Museum be replaced and that the Paisley Park Museum host lavish events at the expense of the museum. McMillan and Spicer rejected those and other demands by Sharon. Sharon later accused them of fraud and attempted to sell her interests in Prince Legacy without the consent of the other Members in violation of the LLC Agreement.

Some of Sharon's family members came to her side. Beginning in December 2023, Sharon, Norrine, and two of the Trust's three trustees, Breanne and Allen (with Sharon and Norrine, "Defendants"), attempted to amend the LLC Agreement.

---

[10] *Id.* § 7.1.

5

Their first effort occurred during a December 13, 2023 Members' meeting. Counsel for Defendants proposed a vote to adopt an amended agreement (the "Amended LLC Agreement"). Among other things, the Amended LLC Agreement removed McMillan and Spicer as Managing Members and replaced them with Sharon, Norrine, and the Trust.[11] It also included a new forum selection provision, requiring that all actions arising out of the Amended LLC Agreement be brought in Minnesota.[12] It further relaxed the unanimous approval requirement of Section 7.1 concerning the transfer and sale of membership interests.[13] The proposal was not on the agenda, so McMillan and Spicer did not allow the Members to vote on it.

Defendants requested that a vote to amend the LLC Agreement be added to the agenda for the next Members' meeting, then scheduled for December 20, 2023. McMillan and Spicer cancelled the December 20 meeting. Defendants purported to hold the meeting anyway. Also on December 20, Defendants executed a written consent (the "Written Consent") adopting the Amended LLC Agreement.[14] Defendants informed McMillan, Spicer, and the third trustee of the Trust, Johnny (collectively, "Plaintiffs"), of their December 20 actions by letter on December 26.

### D.  This Litigation

Plaintiffs filed this action on January 5, 2024. The Complaint contains three counts.

---

[11] Compl. Ex. D (Am. LLC Agr.) § 6.1.

[12] *Id.* § 13.6.

[13] *Id.* § 7.1.

[14] Compl. Ex. E (Written Consent) at 1.

- In Count I, filed pursuant to Sections 18-110 and 18-111 of the LLC Act, Plaintiffs seek a declaration concerning the invalidity of the Amended LLC Agreement and the Written Consent.

- In Count II, Plaintiffs claim that Defendants breached the LLC Agreement by purportedly amending it and removing McMillan and Spicer as Managing Members.

- In Count III, Plaintiffs claim that Defendants breached the covenant of good faith and fair dealing implied in the LLC Agreement.

The court expedited resolution of whether Defendants validly amended the LLC Agreement and removed McMillan and Spicer as Managing Members.[15] The court also granted Plaintiffs' motion for a status quo order keeping McMillan and Spicer as the Managing Members during this action.[16]

Defendants moved to dismiss the Complaint, and Plaintiffs moved for summary judgment on Count I.[17] The court heard argument on both motions.[18]

## II. LEGAL ANALYSIS

Defendants moved to dismiss under myriad provisions. Under Rule 12(b)(1), Defendants argue that the court lacks subject matter jurisdiction over the contract claims against them. Under Rule 12(b)(2), Defendants argue that the court lacks personal jurisdiction over them. Under Rule 12(b)(3), Defendants argue that this court is an improper forum in light of a forum selection provision contained in the Amended LLC Agreement. Under Rule 12(b)(6), Defendants argue the Complaint

---

[15] *See* Dkt. 30 ("1/25/24 Hr'g Tr.") at 41:2–14.

[16] Dkt. 24.

[17] Dkt. 18; Dkt. 39.

[18] Dkt. 65 ("4/26/24 Hr'g Tr.").

7

fails to state a claim. Defendants also moved to strike Plaintiffs' request for fees and costs.

Plaintiffs moved for summary judgment on Count I of their Complaint, arguing that the Written Consent amending the LLC agreement was invalid and that McMillan and Spicer are the Managing Members of Prince Legacy.

## A. Subject Matter Jurisdiction

The Court of Chancery acquires subject matter jurisdiction when the complaint states a claim for relief that is equitable in character, the complaint requests an equitable remedy, or Chancery is vested with jurisdiction by statute.[19] The plaintiff bears the burden of establishing the court's subject matter jurisdiction.[20]

Plaintiffs argue that Section 18-110 of the LLC Act provides subject matter jurisdiction over Count I. Section 18-110 provides this court with subject matter jurisdiction to resolve disputes concerning "the validity of any admission, election, appointment, removal or resignation of a manager of a limited liability company."[21] Count I falls within the scope of Section 18-110, and the court therefore has subject matter jurisdiction over it.

---

[19] *Vama F.Z. Co. v. WS02, Inc.*, 2021 WL 1174690, at *2 (Del. Ch. Mar. 29, 2021) (quoting *Perlman v. Vox Media, Inc.*, 2019 WL 2647520, at *4 (Del. Ch. June 27, 2019), *aff'd*, 249 A.3d 375 (Del. 2021) (TABLE)).

[20] *See, e.g.*, *Hall v. Coupe*, 2016 WL 3094406, at *2 (Del. Ch. May 25, 2016); *Morgan v. Carpenter*, 2014 WL 7192476, at *3 (Del. Ch. Dec. 18, 2014); *Pitts v. City of Wilm.*, 2009 WL 1204492, at *5 (Del. Ch. Apr. 27, 2009).

[21] 6 *Del. C.* § 18-110.

Plaintiffs argue that Section 18-111 of the LLC Act provides subject matter jurisdiction over Counts II and III. Section 18-111 grants this court jurisdiction "to interpret, apply or enforce the provisions of a limited liability company agreement," which is what Counts II and III seek to do.[22] The court therefore has subject matter jurisdiction over Counts II and III.

Defendants' Rule 12(b)(1) motion is denied.

## B. Personal Jurisdiction

Defendants moved to dismiss the Complaint for lack of personal jurisdiction under Rule 12(b)(2).[23] "'Generally, a plaintiff does not have the burden to plead in its complaint facts establishing a court's personal jurisdiction over [a non-resident] defendant.'"[24] But when Rule 12(b)(2) is invoked, the plaintiff carries this burden.[25] Where no discovery has been conducted, the plaintiff must make a prima facie factual showing.[26] "Still, allegations regarding personal jurisdiction in a complaint are presumed true, unless contradicted by affidavit, and, as with a motion to dismiss under Rule 12(b)(6), the court must construe the record in the light most favorable to the plaintiff."[27]

---

[22] 6 *Del. C.* § 18-111.

[23] Ct. Ch. R. 12(b)(2).

[24] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 800 (Del. Ch. 2020) (alteration added) (quoting *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996)).

[25] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 438 (Del. 2005).

[26] *Focus Fin.*, 241 A.3d at 801 (citing *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007)).

[27] *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *7 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012) (TABLE).

When deciding a Rule 12(b)(2) motion, "[t]he court engages in a two-step analysis: the court must first determine that service of process is authorized by statute and then must determine that the exercise of jurisdiction over the nonresident defendant comports with traditional due process notions of fair play and substantial justice."[28] The court conducts this analysis as to each count.

Defendants' personal jurisdiction argument is misplaced as to Count I because it asserts a claim that the court adjudicates *in rem* rather than *in personam*. Section 18-110 of the LLC Act provides that:

> the Court of Chancery may hear and determine the validity of any admission, election, appointment, removal or resignation of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company, and, in case the right to serve as a manager is claimed by more than 1 person, may determine the person or persons entitled to serve as manager.[29]

Under this statute, the office is the *res*, and the court has power to adjudicate title to the *res*.[30] Rather than asserting personal jurisdiction over potential holders to the

---

[28] *Ryan*, 935 A.2d at 265 (citations omitted).

[29] 6 *Del. C.* § 18-110(a).

[30] *Feeley v. NHAOCG, LLC*, 2012 WL 966944, at *5 (Del. Ch. Mar. 20, 2012) ("Because a Section 18-110 proceeding affects the Delaware LLC and the office of managing member, it is not necessary for all claimants to the office to be subject to the Court's *in personam* jurisdiction in order for the Court to make an authoritative determination." (citing *Haft v. Dart Gp. Corp.*, 1996 WL 255899, at *2 (Del. Ch. Apr. 26, 1996))).

*res*, those claimants are given notice, and they can decide whether to appear to contest their claim.[31]

No one disputes that Section 18-110 applies and that Defendants were served in accordance with its provisions. If they choose to ignore the notice, "[t]heir failure to participate . . . will not foreclose" this court's ability to resolve the issue of their entitlement to the seat they claim.[32] This conclusion has the practical effect of rendering the personal jurisdiction question as to Count I irrelevant.

As to Counts II and III, Plaintiffs rely on Section 18-109 of the LLC Act as a basis for personal jurisdiction. Section 18-109 is an implied consent statute by which LLC managers submit to the jurisdiction of Delaware courts.[33] Defendants respond that persons who merely *claim* to be managers do not impliedly consent to this court's jurisdiction under Section 18-109. But Defendants are wrong. By claiming title as a manager of a Delaware LLC, a defendant consents to the personal jurisdiction of the Delaware courts under Section 18-109.

On this point, the United States District Court for the District of Delaware's decision in *American Institutional Partners, LLC v. Fairstar Resources LTD.*[34] is

---

[31] *Id.* ("What is necessary under our statute, and under the constitution, is that reasonable steps be taken to notify claimants to the office of the forthcoming adjudication and that they receive an opportunity to be heard." (quoting *Haft*, 1996 WL 255899, at *2)).

[32] *Id.* (emphasis omitted) (quoting *Haft*, 1996 WL 255899, at *2).

[33] 6 *Del. C.* § 18-109 (providing that a manager of a Delaware LLC may be served with process in all civil actions "involving or relating to the business of the limited liability company or a violation by the manager . . . of a duty to the limited liability company or any member of the limited liability company").

[34] 2011 WL 1230074 (D. Del. Mar. 31, 2011).

11

instructive. There, the defendants claimed managerial status and that claim, among others, was the subject of the litigation. The plaintiffs identified Section 18-109 as the basis for personal jurisdiction.[35] The defendants moved to dismiss under Rule 12(b)(2), arguing that the plaintiffs' dispute over the defendants' managerial status foreclosed the plaintiffs' reliance on the implied consent statute as a basis for jurisdiction. After a scholarly examination of Section 18-109, Judge Leonard P. Stark rejected the defendants' argument. He interpreted the language of Section 18-109 as "encompass[ing] actions against purported managers who may never have been actual managers."[36] He reasoned that "the Defendants alleged assertion of managerial interests is sufficient to justify haling Defendants into a Delaware court."[37]

As in *Fairstar*, Defendants here claim managerial status over a Delaware LLC.[38] Whether or not Defendants succeeded in achieving Managing Member status,

---

[35] *Id.* at *6.

[36] *Id.* at *7.

[37] *Id.* Judge Stark's reasoning is consistent with estoppel principles. Framed in those terms, a person cannot claim status as managers of a Delaware LLC but deny the implication of that status, including a consent to personal jurisdiction. *Cf. Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *3 (Del. Ch. Sept. 18, 2019) (observing that equitable estoppel exists "'to prevent someone from accepting the benefits of a contract without accepting its obligations'" and that, "in the context of forum selection provisions, equitable estoppel 'prevents a non-signatory to a contract from embracing the contract, and then turning her back on the portions of the contract, such as a forum selection clause, that she finds distasteful'" (first quoting *Plaze, Inc. v. Callas*, 2019 WL 1028110, at *8 (Del. Ch. Feb. 28, 2019), then quoting *Cap. Gp. Cos., Inc. v. Armour,* 2004 WL 2521295, at *6 (Del. Ch. Oct. 29, 2004))).

[38] Written Consent at 1; Am. LLC Agr., signature pages (Sharon, Norrine, Breanna, and Allen signing the Amended LLC Agreement as the Managing Members).

by claiming to be Managing Members and taking action to manage the business and affairs of the Company, Defendants impliedly consented to this court's exercise of personal jurisdiction under Section 18-109. Accordingly, under Section 18-109, the court can exercise service of process on Defendants.

The minimum-contacts test is also satisfied. The minimum-contacts analysis asks whether "the exercise of jurisdiction over the nonresident defendant comports with traditional due process notions of fair play and substantial justice."[39] Defendants purposefully availed themselves of this forum when taking action to appoint themselves as Managing Members. At a minimum, having claimed that status, it was foreseeable that they would be subject to litigation in Delaware over their conduct.[40]

Another factor relevant to the minimum-contacts analysis is "the forum State's interest in adjudicating the dispute."[41] That is satisfied here. "Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of an LLC formed under its law to properly discharge their respective managerial functions."[42] "Due process is satisfied as long as (i) the allegations against the defendant-manager focus centrally on the defendant's rights, duties and obligations

---

[39] *Ryan*, 935 A.2d at 265 (citations omitted).

[40] *See Hazout v. Tsang Mun Ting,* 134 A.3d 274, 293–94 (Del. 2016) (reaching similar conclusion as to directors of a Delaware corporation subject to 10 *Del. C.* § 3114).

[41] *In re P3 Health Gp. Hldgs., LLC*, 285 A.3d 143, 157 (Del. Ch. 2022) (cleaned up).

[42] *Id.* (citations omitted); *see Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *13 (Del. Ch. Mar. 31, 2003) ("this state has a strong interest in resolving disputes regarding the internal affairs of LLCs formed under its laws" (citation omitted)).

as a manager of a Delaware LLC, and (ii) the resolution of the matter will be inextricably bound up in Delaware law."[43]  Defendants are alleged to have breached the LLC Agreement by purporting to remove the Managing Members and amend the LLC Agreement.  The allegations underlying the claims focus on Defendants' rights to act as managing members of a Delaware LLC.  And resolution of the dispute is inextricably bound up in the control dispute analysis and requires applying Delaware law.[44]

Accordingly, personal jurisdiction is proper under the implied consent statute to adjudicate Counts II and III, and Defendants' motion to dismiss on that ground is denied.

## C.    Venue

Defendants moved to dismiss the Complaint under Rule 12(b)(3), arguing that this court is not a proper venue in light of the Minnesota forum selection provision found in the Amended LLC Agreement.[45]  Before that provision can be effective, however, the Amended LLC Agreement must be effective.[46]  As discussed below, the Amended LLC Agreement was not valid.  Thus, the forum provision is not implicated.

Defendants' Rule 12(b)(3) motion is denied.

---

[43] *P3 Health Gp. Hldgs.*, 285 A.3d at 157 (citation omitted).

[44] *Id.* at 158 (finding due process prong satisfied where the functional manager was sued for, among other claims, tortious interference of the LLC agreement, because Delaware was the state that "gave life to the Company, whose law will govern the dispute, and which has a powerful interest in providing a forum for adjudicating litigation involving its entity citizens").

[45] Dkt. 42 ("Defs.' Mot. to Dismiss Opening Br.") at 39–41.

[46] Defendants conceded this point.  *See* 1/25/24 Hr'g Tr. at 30:9–23, 31:22–32:2.

14

## D.    Failure To State A Claim

Defendants moved to dismiss the Complaint under Rule 12(b)(6).  "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[47]  When considering a motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[48]  The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[49]

LLC agreements are enforceable in the same manner as other contracts.  To state a claim for breach of contract, a plaintiff must adequately allege "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[50]  Delaware courts follow the objective theory of contracts, giving words "their plain meaning unless it appears that the parties

---

[47] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[48] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[49] *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018).

[50] *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020) (citation omitted), *aff'd*, 268 A.3d 198 (Del. 2021).

intended a special meaning."[51]  In practice, the objective theory requires that a court "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[52]  In so doing, the court evaluates the relevant provision's semantics, syntax, and context, aided by interpretive canons.

Plaintiffs claim that Defendants lacked the authority to call a meeting of Members to amend the LLC Agreement or amend the LLC Agreement by written consent.  Defendants say that the LLC Agreement granted them this authority.  Primarily, the parties base their positions on competing interpretations of Sections 6.2, 6.5, and 6.3 of the LLC Agreement.

Section 6.2, titled "Duties of the Managing Members," provides that:

> The Managing Members shall be responsible for the day-to-day management of the Company's business and affairs and shall devote such time and effort to the Company as shall reasonably be required for its welfare and success. The Managing Members shall coordinate meetings, conference calls, and communicate as reasonably required subject to a meeting once every other meeting [sic].  With respect to contractual and legal matters handled by the Managing Members, McMillan shall provide and make the final decision on such business and legal matters. Specifically, except as otherwise limited in this Agreement, the Managing Members are authorized to own, hold, manage, administer, operate, lease, sell, exchange, pledge, encumber, transfer, purchase, grant options related to, and

---

[51] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013) (citing *AT & T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008)); *see also Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) ("A contract's construction should be that which would be understood by an objective, reasonable third party." (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010))).

[52] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone*, 106 A.3d at 368).

otherwise deal with the Company assets in Delaware or any other state on behalf of the Company, except as otherwise provided in Section 6.3. In the event any Managing Member fails to be able to perform his responsibilities or fails to provide day-to-day management of the Company, such Managing Member can be removed and/or replaced by the vote of the Members subject to the remaining Managing Member's mutual consent . . . .[53]

Section 6.5, titled "Members Who Are Not a Managing Member" provides:

A Member who is not a Managing Member shall not participate in the control of the Company's affairs and shall have no right or authority to act for or to bind the Company. The Member hereby consents to the exercise by the Managing Members of the powers conferred by this Agreement and to the employment, when and if the same is deemed necessary or advisable, of such brokers, agents, accountants, attorneys, and such other advisors as the Managing Members may determine to be appropriate for the management of the Company business, subject to consultation with all the Members.[54]

Section 6.3, titled "Limitations on Authority of Managing Members," identifies 28 actions over which Non-Managing Members have a say. As to nine of the 28 actions, consent of 100% of the Members' Percent Interest is required.[55] As to the remaining 19, the agreement provides that: "Notwithstanding the provisions of Section 6.2 above: (a) the consent of at least sixty-six and two thirds percent (66 2/3 %) of the Percentage Interests then held by the Members shall be required to do any

---

[53] LLC Agr. § 6.2.

[54] *Id.* § 6.5.

[55] *Id.* § 6.3(b).

of the following: . . . ."[56] The list of 19 actions includes: "Amend this Agreement, except as otherwise provided in Section 6.2."[57]

Plaintiffs interpret these provisions collectively to prohibit a Non-Managing Member from participating in the control of the Company or seeking to bind the Company, including by amending the LLC Agreement and proposing agenda items.[58] Their interpretation begins with Section 6.2, which grants the Managing Members broad authority over the Company's business and affairs.[59] Plaintiffs' interpretation turns next to Section 6.5, which affirmatively prohibits Non-Managing Members from "participat[ing] in the control of the Company's affairs" of "act[ing] for" or "bind[ing] the Company."[60] To them, Section 6.3 provided a limited exception to these two general principles, providing Non-Managing Members with veto rights over the 28 enumerated actions.[61] Section 6.3 does not give Non-Managing Members a unilateral right to ensure that the 28 enumerated actions be taken, Plaintiffs say.

Plaintiffs rely on Section 5.3 to bolster their interpretation. Titled "Member Meetings," Section 5.3 provides:

> The Members shall meet no less than required under the Act and shall meet every other month to provide

[56] *Id.* § 6.3(a).

[57] *Id.* § 6.3(a)(19).

[58] 4/26/24 Hr'g Tr. at 19:4–16.

[59] Among other things, it authorizes the Managing Members to "own, hold, manage, administer, operate, lease, sell, exchange, pledge, encumber, transfer, purchase, grant options related to, and otherwise deal with the Company assets . . . except as otherwise provided in Section 6.3 hereunder." LLC Agr. § 6.2.

[60] *Id.* § 6.5.

[61] *Id.* § 6.3.

18

> meaningful input and consultation on matters related to the Company. During the Member Meetings, the Members shall have the right to review the then current bank statements of the Company.[62]

The language "meaningful input and consultation" is a marked departure from words like "direction" or "control" and emphasizes the limited and advisory role that Non-Managing Members play under the parties' contractual scheme. It is also a marked departure from the specific right set out in the second sentence of Section 5.3—to review then-current bank statements. The second sentence reflects that the drafters of the LLC Agreement knew how to grant affirmative rights to Non-Managing Members, but failed to do so in the way that Defendants suggest.

Defendants read these provisions differently. Their interpretation starts with Section 6.3, which they read to mean that actions enumerated in Section 6.3 "may be taken by Members holding 66 2/3% of the Percentage Interests . . . regardless of whether such action was first presented or proposed by a Managing Member . . . ."[63]

They further say that nothing in either 6.2 or 6.5 affirmatively prohibits Non-Managing Members from amending the LLC Agreement. They argue that Section 6.2 grants the Managing Members broad but not exclusive authority to operate the day-to-day business of the Company. They acknowledge that Section 6.5 prohibits a Non-Managing Member from controlling the Company's affairs, but they cabin this prohibition to Non-Managing Members who act in their individual capacity. They say that the LLC Agreement requires that "Members, *as a whole*, . . . make certain

---

[62] *Id.* § 5.3.

[63] Defs.' Mot. to Dismiss Opening Br. at 21.

19

decisions by a majority or super majority vote or agreement" and that, "by voting collectively according to the powers granted in the [LLC Agreement], no Non-Managing Member alone is participating in the control of the Company's affairs."[64]

Defendants point to Section 13.3 to bolster their position. Titled "Modifications," Section 13.3 provides:

> Except as otherwise provided in Section 6.3(b), no amendment or modification of this Agreement shall be valid or binding unless such amendment or modification is in writing and is signed by a majority of the Members holding not less than sixty-six and two thirds percent (66 2/3 %) of the Percentage Interests then held by the Members.[65]

They say that nothing in Section 13.3 requires or states that the Managing Members *must* approve an amendment to the LLC Agreement.[66] Nor is there anything in the LLC Agreement requiring that the Managing Members propose the vote in the first place or present it to the Members at a Members' meeting.[67]

Plaintiffs' interpretation is the only reasonable one. Through Section 6.5, Non-Managing Members explicitly divested themselves of any right to "participate in the control of the Company's affairs" and any "right or authority to act for or to bind the Company."[68] It is true that the language of Section 6.5 refers to a "Member," singular, but that is of no consequence. By actively working together to restructure and revise

---

[64] Dkt. 58 at 19–20 (emphasis added).

[65] LLC Agr. § 13.3.

[66] Defs.' Mot. to Dismiss Opening Br. at 23–24.

[67] *Id.*

[68] LLC Agr. § 6.5.

20

the governance of the Company, including the mechanism by which Members can transfer or sell their assets, Defendants participated in the control of the Company in violation of Section 6.5. Through Section 6.2, the LLC Agreement empowers the Managing Members to manage the "business and affairs" of the Company. Section 6.3 does not reverse the language of Section 6.5 by providing Non-Managing Members with a right to unilaterally direct Company action. Rather, it gives them the ability to consent or veto 28 specific actions proposed by the Managing Members.

This court's decision in *2009 Caiola Family Trust v. PWA, LLC* confirms Plaintiffs' reading of the LLC Agreement.[69] There, non-managing members who collectively held a 90% interest in the defendant LLC argued that a provision similar to Section 6.3 gave them affirmative decision-making authority over the actions enumerated in the provision, which included terminating and replacing the manager. The introductory language of the disputed provision, found in Section 8.4 of the LLC agreement, provided that:

> The prior written approval of a Majority Vote of the Non–Managing Members shall be required for the Company to take, or enter into any agreement to take, any of the following actions, and the Managing Member will use all commercially reasonable efforts to carry out and implement any of the following decisions approved by a Majority Vote of the Non–Managing Members.[70]

---

[69] 2014 WL 1813174, at *7–9 (Del. Ch. Apr. 30, 2014) (finding disputed provision provided non-managing members "with a limited veto power over the actions enumerated in that section, not with the unilateral authority to compel the Company or the Managing Member to take those actions").

[70] *Id.* (citing section 8.4(a) of the LLC agreement at issue in that action).

21

Vice Chancellor Parsons granted summary judgment for the managing members based on the plain language of Section 8.4 and the structure of the agreement.

The Vice Chancellor reasoned that, by its plain language, Section 8.4 did not grant non-managing members a unilateral right to take enumerated actions. He noted that the phrase "prior written approval" in the first clause, and reference to "approved by" in the second clause, gave the non-managing members a "veto right"— that is, a right to *approve* (or not approve) a decision made by the managing members.[71] It did not give them "the affirmative authority to mandate unilaterally that any of the enumerated actions be taken."[72]

The structure of the agreement bolstered the Vice Chancellor's conclusion. A separate provision, Section 6.1, gave the managing member the "'sole and exclusive control over the Company' and the 'power and authority to take such actions' as he deems appropriate in the 'conduct of the business and affairs of the Company.'"[73] Under this contractual scheme, "by default, the power to make decisions on behalf of the Company rests with the Managing Member."[74]

Section 6.2 of the LLC Agreement is similar to Section 6.1 of the agreement in *Caiola*. Section 6.2 provides that "Managing Members shall be responsible for the day-to-day management of the Company's business and affairs . . . ."[75] Although it

---

[71] *Id.* at *8.

[72] *Id.*

[73] *Id.* at *9 (quoting Section 6.1 of the LLC agreement at issue in that action).

[74] *Id.*

[75] LLC Agr. § 6.2.

22

does not expressly give the Managing Members the "sole and exclusive" authority to conduct the Company's business and affairs, that distinction is without significance here because Section 6.5 of the LLC Agreement is to the same effect.

Contrary to Defendants' assertion, Section 13.3 does not support their interpretation of Section 6.3(a)(19). Section 13.3 is a formalities clause that sets forth the mechanics for an amendment to the LLC Agreement pursuant to Section 6.3(a)(19)—that is, one approved by the Managing Members with the consent of 66 2/3% of the Percentage Interests. Any such amendment must be in writing and signed by at least 66 2/3% of the Members' Percent Interests for it to be valid and binding. It does not confer on the Non-Managing Members the power to unilaterally propose and adopt amendments. Nor does it trump Section 6.5 and the prohibition on non-Managing Members binding the Company as Defendants purported to do by amending the LLC Agreement.

Moreover, Defendants' interpretation of Section 6.3(a)(19), and by necessity Section 6.3(a), would lead to the absurd result of giving the Non-Managing Members the authority to unilaterally take actions on behalf of the Company and bind the Company without the approval of the Managing Members in violation of Section 6.5. This reading would render much of Sections 6.2 and 6.5 mere surplusage, as it would allow the Non-Managing Members to discard the entire management structure established by the LLC Agreement. Defendants' interpretation also cannot be reconciled with Section 6.5, whereby the Non-Managing Members expressly relinquished any authority to bind the Company.

23

Perhaps most compelling, Plaintiffs' interpretation is consistent with the Managing Member-removal provisions of the LLC Agreement. Section 6.2 states that a Managing Member can be removed where the "Managing Member fails to be able to perform his responsibilities or fails to provide day-to-day management of the Company" and the "remaining Managing Member" has consented to the removal.[76] Allowing Members to remove Managing Members by amending the LLC Agreement absent these circumstances would undermine the plain language of Section 6.2.

For completeness, the analysis addresses the parties' quibble over the clauses beginning with "notwithstanding" and "except as provided in" in Section 6.3. Again, Plaintiffs' interpretation of these clauses is the only reasonable one.

Defendants argue that the "[n]otwithstanding the provisions of 6.2" language in Section 6.3 means that "despite what is set forth by Section 6.2, the actions identified in Section 6.3 may be taken by Members holding 66 2/3% of the Percentage Interests. In other words, as long as Members holding 66 2/3% of the Percentage Interests approve any action in Section 6.3(a), they can take any such action, regardless of whether such action was first presented or proposed by a Managing Member or a Non-Managing Member."[77] Defendants read Section 6.3 as invalidating Section 6.2.

The word "notwithstanding" in Section 6.3 does not help Defendants. Reading Sections 6.2 and 6.3 together, the "notwithstanding" language operates to harmonize

---

[76] *Id.* § 6.2.

[77] Defs.' Mot. to Dismiss Opening Br. at 21 (internal quotation marks omitted).

24

the language in Section 6.2. That is because absent the term "notwithstanding," there might be some conflict between Section 6.2, which gives the Managing Members broad authority, and Section 6.3, which gives the Non-Managing Members veto rights as to certain decisions.[78]

Defendants also argue that the "except as otherwise provided in Section 6.2" language means that the LLC Agreement "may be amended *unless* Section 6.2 specifically provides that it cannot be amended."[79] Thus "the provision of Section 6.3(a)(19) that allows amendment of the [LLC agreement] 'except as otherwise set forth in Section 6.2' refers **only** to the provisions of Section 6.3 that require unanimous consent."[80] Defendants believe that those items that require a 66 2/3% vote are not subject to the Managing Members' input or consent.

Defendants read Section 6.2 too narrowly. Section 6.2 provides that "[t]he Managing Members shall be responsible for the day-to-day management of the Company's business and affairs and shall devote such time and effort to the Company

---

[78] *In re Est. of Crist*, 863 A.2d 255, 258 (Del. Ch. 2004) ("The use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." (quoting *Cisneros v. Alpine Ridge Gp.*, 508 U.S. 10, 18 (1993))), *aff'd*, 879 A.2d 602 (Del. 2005) (TABLE).

Together, Sections 6.2 and 6.3 provide the framework for the Managing Members' authority to act on behalf of the Company, and the limitations on such authority. *See, e.g.*, *EMSI Acq., Inc. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *10 (Del. Ch. May 3, 2017) (citation omitted); *see also AG Oncon, LLC v. Ligand Pharm. Inc.*, 2019 WL 2245976, at *7 (Del. Ch. May 24, 2019), *aff'd*, 224 A.3d 963 (Del. 2020).

[79] Defs.' Mot. to Dismiss Opening Br. at 28 (emphasis in original).

[80] *Id.* at 29 (bold in original).

25

as shall reasonably be required for its welfare and success."[81]  Section 6.3 already lists out the items that need unanimous consent, so that cannot be it.  Instead, the plain meaning of the term "except as otherwise provided" means that if there is a conflict between Section 6.2 and Section 6.3(a)(19), Section 6.2 governs.[82]  As stated above, allowing the Non-Managing Members to govern interferes with the rights given to the Managing Member in Sections 6.2 and 6.5.

In the end, Plaintiffs' contractual analysis prevails.  The effect of this conclusion is that Counts I and II of the Complaint state a claim.  Count III does not.

In Count I, Plaintiffs seek a declaration pursuant to Section 18-110 that: Defendants do not have the authority to unilaterally amend the LLC Agreement, Defendants did not amend the LLC Agreement, the LLC Agreement remains in effect, and McMillan and Spicer remain the Managing Members of the Company.  As a matter of contract law, this is the only reasonable interpretation.

To support a claim for declaratory relief, however, Plaintiffs must also plead that an actual controversy exists.[83]

Defendants do not meaningfully dispute that Plaintiffs have made this showing.  Instead, they argue that Plaintiffs have failed to state a claim for the

---

[81] LLC Agr. § 6.2.

[82] In any event, Defendants' argument does not work because Section 6.2 explicitly provides that the Managing Members must consent to each other's termination, which did not happen.

[83] *Tygon Peak Cap. Mgmt., LLC v. Mobile Invs. Investco, LLC*, 2022 WL 34688, at *9 (Del. Ch. Jan. 4, 2022) (quoting *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479–80 (Del. 1989)), *aff'd*, 315 A.3d 445 (Del. 2024) (TABLE).

26

specific declaration that Plaintiffs seek. But the contractual analysis instructs otherwise. Plaintiffs have stated a claim for declaratory judgment.

In Count II, Plaintiffs claim that Defendants materially breached the LLC Agreement by acting without authorization to amend it, declaring that it has been amended, and removing McMillan and Spicer as Managing Members.

To state a claim for breach of contract, a plaintiff must adequately allege "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[84]

Plaintiffs here allege that Defendants breached the LLC Agreement by purporting to remove the Managing Members and amend the LLC Agreement. As stated in the above analysis, that allegation is adequately alleged. Plaintiffs have stated a claim for breach of contract.[85]

In Count III, Plaintiffs claim that Defendants breached the implied covenant of good faith and fair dealing by removing the Managing Members and amending the LLC Agreement.[86]

---

[84] *AB Stable VIII LLC*, 2020 WL 7024929, at *47 (citation omitted).

[85] *See also Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) ("the threshold for the showing a plaintiff must make to survive a motion to dismiss is low").

[86] Compl. ¶¶ 109–15.

"The implied covenant is inherent in all contracts."[87] But it is "a limited and extraordinary legal remedy"[88] whose application is a "cautious enterprise."[89] "[T]he implied covenant 'does not apply when the contract addresses the conduct at issue,' but only 'when the contract is truly silent' concerning the matter at hand."[90] As discussed above, the LLC Agreement covers the relevant ground. There is no gap to fill. Count III is dismissed.

### E.    Costs and Fees

Defendants argue that the court should strike Plaintiffs' demand for costs and fees because "[c]osts and fees are improper in a Section 18-110 proceeding."[91] Defendants cite to *Avgiris Brothers, LLC v. Bouikidis*[92] for that proposition. There, however, the court declined to shift fees to the defendants where it had found that it lacked personal jurisdiction over them.[93] The court has found that it can exercise personal jurisdiction over Defendants, so Defendants' basis for striking Plaintiffs' requests for costs and fees is rejected.

---

[87] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (citation omitted).

[88] *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010)).

[89] *Nemec*, 991 A.2d at 1125 (citations omitted).

[90] *Oxbow*, 202 A.3d at 507 (first quoting *Nationwide Emerging Managers, LLC v. Northpointe Hldgs. LLC*, 112 A.3d 878, 896 (Del. 2015), then quoting *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006)).

[91] Defs.' Mot. to Dismiss Opening Br. at 37.

[92] 2023 WL 7137104 (Del. Ch. Oct. 31, 2023).

[93] *Id.* at *3.

## F.      Summary Judgment

Under Court of Chancery Rule 56, summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[94]  On a motion for summary judgment, unlike a motion to dismiss, the court may consider evidence obtained in discovery, affidavits, and declarations.[95]  The court must view the evidence "in the light most favorable to the non-moving party, and the moving party bears the burden of demonstrating the absence of a material factual dispute."[96]  On the other hand, if "there are material factual disputes, that is, if the parties are in disagreement concerning the factual predicate for the legal principles they advance, summary judgment is not warranted."[97]  "There is no 'right' to a summary judgment."[98]

For the reasons stated above, the LLC Agreement is unambiguous and Plaintiffs' interpretation is the only reasonable one.  Accordingly, Plaintiffs are entitled to summary judgment on Count I.[99]

---

[94] Ct. Ch. R. 56(c).

[95] *See id.*; *see also In re Gardner Denver, Inc.*, 2014 WL 715705, at *4 (Del. Ch. Feb. 21, 2014) (describing the standard for converting a motion to dismiss to a motion for summary judgment when matters outside the pleadings are presented to the court).

[96] *XO Commc'ns, LLC v. Level 3 Commc'ns, Inc.*, 948 A.2d 1111, 1117 (Del. Ch. 2007) (citation omitted).

[97] *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992).

[98] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002) (citations omitted).

[99] *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007) ("Where the dispute centers on the proper interpretation of an unambiguous contract, summary judgment is appropriate because such interpretation is a question of law." (citation omitted)); *see GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*,

## III.  CONCLUSION

For the foregoing reasons, Defendants' motion is granted in part, and denied in part.  Plaintiffs' motion for summary judgment on Count I is granted.

---

36 A.3d 776, 783 (Del. 2012) (finding summary judgment appropriate where language at center of the contractual dispute was "clear and unambiguous" (citations omitted)).